AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF _____

UNITED STATES OF AMERICA

V.

WILLIAM TURBAK
42 Burt Street
Acushnet, MA
(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 2004 M 0460 RBC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about **January 23, 2004** in **Bristol** county, in the District of **Massachusetts** defendant(s) did, (Track Statutory Language of Offense)

conspire to possess with intent to distribute and to distribute a mixture or substance containing a detectable amount of marijuana

in violation of Title **21** United States Code, Section(s) **841 and 846**.

I further state that I am a(n) **DEA Task Force Agent** and that this complaint is based on the following
                                                Official Title
facts:

See Affidavit attached hereto and incorporated herein by reference

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

01-23-2004  at 8:14 pm                    at  Boston                  , Mass
Date                                                City and State

Robert B. Collings
U.S. Magistrate Judge                              _____
Name & Title of Judicial Officer                    Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT OF TASK FORCE AGENT DEAN M. FREDERICKS

I, Dean M. Fredericks, being duly sworn, do hereby depose and state under oath as follows:

1. I am employed by the New Bedford Police Department and have been so employed for the past nine years. I have been a Detective for the past five years and have been assigned to the U.S. Drug Enforcement Administration ("DEA") New Bedford Resident Office for the past 23 months. Throughout my nine years as a law enforcement officer, I have participated in narcotics investigations and have done so exclusively during the past 23 months during my assignment with DEA. I have received specialized training in the investigation of narcotics cases from DEA, the Massachusetts State Police and the Massachusetts Criminal Justice Training Council. As a duly deputized Task Force Agent, I am an investigative or law enforcement officer of the United States and am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. During the course of my law enforcement career, I have participated in over one hundred narcotics investigations involving the seizure of large amounts of marijuana, cocaine, heroin and other controlled substances. Through my training and experience, I have become familiar with the methods used by drug-traffickers for the packaging and transportation of narcotic substances and/or monies derived from the sale of or used to purchase narcotic substances.

3. I submit this affidavit in support of an application for (a) Criminal Complaints against Michael R. McElroy and William Turbak charging each of them with conspiracy to possess with intent to distribute and to distribute one hundred kilograms or more of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846; (b) a warrant to search the premises located at 521 King Street, Fall River, Massachusetts, including the garage associated therewith, as more fully described in Attachment A-1 hereto; and (c) a warrant to search the premises located at 464 Division Street, Apt. #3R, Fall River, Massachusetts, as more fully described in Attachment A-2 hereto; and (c) a warrant to search the premises located at 42 Burt Street, Acushnet, Massachusetts, as more fully described in Attachment A-2 hereto. In light of the limited purposes of this affidavit, I have not included herein all of the information gathered during this investigation. Upon information and belief, I believe the information set forth herein to be true and accurate based upon my own participation in the underlying investigation as well as upon information provided to me by other law enforcement officers.

## BACKGROUND OF THIS INVESTIGATION

4. In late October of 2003, U.S. Border Patrol ("USBP") agents at the Texas-Mexico border intercepted a crate containing approximately 525 pounds of marijuana. Documents associated with the crate indicated that it was to have been delivered to Xpress Global Systems ("Global") at its Phoenix, Arizona facility for

shipping on behalf of CSD Solutions, 380 Brooks Drive, Hazelwood, Missouri. From there, the crate was to have been shipped to Global's facility at 52 Williams Street, Everett, Massachusetts ("Global's Everett facility"). Further investigation revealed that Global's internal tracking information indicated that the crate was to picked up at its Everett facility by a representative of "James Distribution" with a contact telephone number of (866)281-1809 in Boston, Massachusetts.

5.  DEA arranged to have the empty crate delivered to Global's Phoenix facility and shipped from there to its Everett facility.

6.  On or about October 27, 2003, a white male later identified as Michael R. McElroy ("McElroy") arrived at Global's Everett facility driving a U-Haul rental truck and inquiring about the crate. McElroy is known to Global personnel at the Everett facility because he has taken delivery of several crates shipped to that facility. Prior to October 27, 2003, McElroy also had called the Global Everett facility inquiring about the crate. McElroy was told (falsely) that the crate had not yet arrived and drove away in the rental truck, followed by one or more surveillance units. McElroy returned the rental truck to a Citgo gas station in Fall River, Massachusetts and departed that location in a green Dodge truck registered to his married sister, Debra Donovan, 521 King Street, Fall River, Massachusetts. McElroy's current driver's license lists that location as his residence. However, since that

time, surveillance observations suggest that he spends much of his time and may reside 464 Division Street, Apt. #3R, Fall River, Massachusetts. McElroy has been observed entering and exiting the dwelling at 464 Division Street through a side door which is more fully described below. Utility records list utilities in the name of Michael McElroy for Apartment 3 North at 464 Division Street in Fall River, Massachusetts. The rear of the dwelling at 464 Division Street is the north side of the dwelling.

7. At some point between approximately October 24 and October 28, 2003, an unidentified male telephoned Global's Everett facility, identified himself as being from CSD Solutions and asked about the crate. At DEA's request, the caller was told that the crate had been lost and then recovered, but that the crate had been damaged and that it no longer had any contents. The caller seemed concerned, requested the empty crate and indicated that he would have somebody come by Global's Everett facility to pick it up.

8. On October 28, 2003, at approximately 9:15 a.m., McElroy again arrived at Global's Everett facility, again driving a rented U-Haul truck. Once the empty crate was loaded into the U-Haul truck, McElroy drove away, followed by one or more surveillance units. McElroy drove from Everett to Fall River, stopping twice and walking around parking lots in a manner which made the surveillance agents believe he was trying to detect surveillance activities. Eventually, McElroy drove the U-Haul truck to 521 King Street in Fall River, where he backed the truck up to the garage.

McElroy went inside for approximately ten minutes, before returning the U-Haul truck to the business from which it had been rented. McElroy departed that location in the same green Dodge truck.

9. Global personnel recalled that CSD Solutions had previously done business with Global under the following name and address: Stauffer Enterprises, 137 Weldon Parkway, Maryland Heights, Missouri. Global personnel further recalled that a crate shipped by Stauffer Enterprises had been lost in transit, following which Stauffer Enterprises began doing business with Global as CSD Solutions.

10. Global personnel checked their internal tracking data for shipments made by CSD Solutions and/or Stauffer Enterprises. Global shipping bills revealed that CSD Solutions and/or Stauffer Enterprises had arranged to have twenty (20) shipments made from Global's Phoenix, Arizona facility to Global's Everett, Massachusetts facility between February 27, 2003 and October 25, 2003. These twenty shipments had a gross weight (shipping crates plus contents) of 15,120 pounds. The crate which had contained the 525 pounds of marijuana weighed 225 pounds. Global personnel indicate that the other 19 shipments had involved crates of similar size and weight. Assuming an average weight of 225 pounds, the aggregate weight of the 20 crates would have been 4,500 pounds. Subtracting the estimated weight of the crates from the gross weight of the 20 shipments yields an estimated net weight of 10,620 pounds for the contents of those 20 shipments.

11. Global's shipping bills include the following information concerning the twenty shipments referenced above:

| Date | Shipper | Consignee | Weight |
|---|---|---|---|
| 2/27/02 | Stauffer | Satellite Electrical | 525 lbs |
| 4/22/02 | Stauffer | Satellite Electrical | 800 lbs |
| 4/23/02 | Stauffer | Satellite Electrical | 550 lbs |
| 6/07/02 | Stauffer | Satellite Electrical | 710 lbs |
| 11/1/02 | Stauffer | Sunset Solar | 775 lbs |
| 11/14/02 | Stauffer | Dedicated Express | 790 lbs |
| 12/6/02 | Stauffer | Radiant Solar | 813 lbs |
| 12/13/02 | Stauffer | Radiant Electric | 818 lbs |
| 1/10/03 | Stauffer | J Mark Distribution | 920 lbs |
| 2/3/03 | Stauffer | Sunset Solutions | 905 lbs |
| 3/13/03 | Stauffer | J Mark Distribution | 350 lbs |
| 3/14/03 | Stauffer | J Mark Distribution | 889 lbs |
| 3/28/03 | Stauffer | J Mark Distribution | 750 lbs |
| 4/25/03 | Stauffer | J Mark Distribution | 700 lbs |
| 6/16/03 | Stauffer | J Mark Distribution | 945 lbs |
| 7/11/03 | CSD Solutions | J Mark Distribution | 750 lbs |
| 8/26/03 | CSD Solutions | Stein Solar | 880 lbs |
| 9/23/03 | CSD Solutions | Byron Installation | 750 lbs |
| 10/7/03 | CSD Solutions | Stein Solar | 750 lbs |
| 10/25/03 | CSD Solutions | James Distribution | 750 lbs |

The last shipment listed above is the one which was intercepted October by the USBP.

12. Personnel at Global's Everett facility McElroy as being the person who took delivery of most, if not all, of the crates shipped to that facility by CSD Solutions and/or Stauffer Enterprises. Within the past few months, Global's Everett facility has required that persons taking delivery of shipments at that facility show driver's licenses for identification purposes. Since this measure was implemented, McElroy has provided a driver's license bearing his true name. Global personnel recognize McElroy as the same person who previously signed for crates using the name Michael Sousa.

13. According to records maintained by the Massachusetts Department of Probation, McElroy is approximately forty-one years old and has an adult criminal record in Massachusetts which contains 113 entries going back to 1979. According to those records, McElroy was convicted in 1997 in New Bedford District Court of possessing heroin; he was convicted in 1994 of possessing a Class B controlled substance (fourth such offense); and he has earlier possessory drug convictions. In 1984, McElroy was convicted of possession with intent to distribute Class D controlled substances and was sentenced to a three-month term in the House of Correction. In 1992, McElroy was convicted in Bristol County Superior Court of unarmed robbery and was given an eight-to-twelve-year split prison sentence, with fifty-two (52) months to serve and the balance suspended, to be followed by probation for three years; however, in 1996, McElroy's probation was revoked and he was committed to serve the balance of his original sentence. Most of McElroy's other convictions are for burlgary-related offenses, larcenies, operating a motor vehicle after his license was suspended and other offenses relating to the operation of motor vehicles.

14. Both Hazelwood, Missouri and Maryland Heights, Missouri are communities within the St. Louis, Missouri metropolitan area. Moreover, Global has facilities all over the United States, including in the St. Louis, Missouri area. Nevertheless, all of the shipments made by CSD Solutions and/or Stauffer Enterprises

through Global have originated at Global's Phoenix, Arizona facility. Based on my training and experience, I know that Phoenix, Arizona is located near the southwestern border of the United States and is considered a source city for the entry of marijuana into the United States.[1]

### Events of January 23, 2004

15. DEA surveillance units observed McElroy exit 464 Division Street at approximately 7:30 a.m. this morning. He drove away in a green Dodge pickup truck registered in his sister's name at 521 King Street in Fall River, Massachusetts. McElroy drove to a U-Haul rental facility in Fall River and, rather than park in the parking lot of the facility, which had empty spaces available, he parked his pickup truck around the corner and down the street from the facility. He then entered the facility and after approximately 45 minutes drove away in a U-Haul box truck.

16. From the U-Haul rental facility in Fall River, McElroy drove (followed by surveillance units) to Forward Air, Inc., a shipping company located at 130 Eastern Avenue in Chelsea, Massachusetts. At approximately 10:00 a.m., one or more

---

[1] On the afternoon of November 19, 2003, personnel from Global's Everett facility contacted DEA to indicate that they had received delivery of three (3) crates which apparently were connected to CSD Solutions. The next day, a Massachusetts State Police canine, Tracer, gave a positive alert to the presence of narcotics in two of the three crates. I applied for and obtained a federal warrant to search the three crates. Upon execution of the search warrant, it was determined that the three crates contained approximately two thousand telephones, but no controlled substances were found.

surveillance units observed McElroy back the U-Haul truck up to a loading dock at Forward Air. Agents subsequently learned from discussions with personnel at Forward Air that McElroy took delivery of a palletized crate weighing approximately 750 (seven hundred and fifty) pounds. Although Forward Air had a bill of lading indicating that the shipper of the crate was located in Seattle, Washington, the same document indicated that the airport of origin was Phoenix, which I know to be located in Arizona.

17. Surveillance units followed McElroy as he drove the U-Haul truck directly from Forward Air in Chelsea to his sister's house at 521 King Street in Fall River, Massachusetts. At that location, McElroy backed the U-Haul truck up the driveway to the detached garage which is to the right of the house and partially set back. The truck appeared to be backed up directly against or in front of a garage door. Almost immediately upon arriving, McElroy exited the truck and entered the house at 521 King Street. Within a very short time, McElroy and an unidentified male exited the residence and proceeded to the U-Haul truck and the garage before disappearing from view.

18. Approximately five minutes later, McElroy drove the U-Haul truck away from the garage and out of the driveway, with the unidentified male seated in the passenger seat. They were followed to the U-Haul facility, where they returned the truck, got into McElroy's Dodge pickup and returned to 521 King Street, where they both entered the residence.

19. Approximately half an hour later, at around 1:45 p.m., a BMW bearing Massachusetts registration number 1572 SM arrived at 521 King Street and backed into the driveway and up to the front of the garage. The driver of the BMW was subsequently identified as William Turbak. Surveillance agents then observed McElroy and Turbak placing several brown bags into the trunk of Turbaks's BMW. After a short while, Turbak got back into the BMW and departed the area followed by surveillance units.

20. After a few minutes, Turbak drove the BMW onto Route 195 East, an interstate highway, followed by at least one unmarked police vehicle driven by DEA Task Force Agent William Delaney, who is also a Massachusetts State Police Sergeant and who was dressed in plainclothes. TFA Delaney observed that Turbak appeared to watching traffic in his rearview mirror so intently that the BMW repeatedly weaved back and forth over the lane markings on the highway. After Turbak's BMW had been on the highway for approximately two miles and had weaved back and forth approximately three to five times, TFA Delaney activated the blue lights, flashing wig-wag lights and siren to cite Turbak for a marked lanes violation. After approximately one-half mile, Turbak slowed down the BMW and pulled over into the breakdown lane. TFA Delaney did likewise. As TFA Delaney opened the door to exit his cruiser, Turbak pulled out of the breakdown lane and accelerated at a high rate of speed. TFA Delaney and other surveillance units took pursuit and succeeded in pulling Turbak over again approximately

one mile away.

21. At that time, Turbak was removed from the vehicle and arrested for refusing to stop for a police officer. Turbak was taken to the State Police Barracks in Dartmouth, Massachusetts and his BMW was towed to that location, where an inventory search was conducted. During the course of the inventory search, three brown paper bags were found in the trunk of the BMW. Written on these bags were the numbers "16," "17" and "18," respectively. Inside each brown bag was a bale of green vegetative matter which TFA Delaney recognized as marijuana. Each bale was contained in plastic wrap and the bale in each bag had the same number written on the plastic wrap as appeared on the exterior paper bag.

22. After he was advised of his Miranda rights, Turbak was asked where he had been coming from and he replied to the effect that he had been coming from Fall River. When he was asked where he had been going to, he replied that he had been going to his home. During the course of his booking, Turbak identified 42 Burt Street, Acushnet, Massachusetts as his residence. This destination is consistent with the direction in which he was traveling at the time he was stopped.

23. Meanwhile, at approximately 2:20 p.m., surveillance agents saw McElroy back his pickup truck up the driveway and up to the front of the garage at 521 King Street, where he was viewed loading something into the flatbed at the rear of the pickup truck. He then departed the area.

24. At approximately 2:50 p.m., McElroy arrived at 205 Pinehurst Avenue in Swansea, Massachusetts. Surveillance agents saw McElroy exit his pickup truck and carry a weighted brown paper bag into the residence at that address. When he exited the residence, McElroy was empty-handed and was placed under arrest for conspiracy to possess with intent to distribute and to distribute marijuana.

25. A DEA agent spoke to the occupant of the residence at 205 Pinehurst Avenue. That individual acknowledged that he had taken delivery of a package from McElroy and gave law enforcement agents consent to search the premises and directed them to a closet in which he had placed the package. The exterior paper bag was marked with the number "15" and the numbers "14.25." It was found to contain a bale of green vegetative matter which the agents recognized as marijuana and which was contained in plastic wrap.

26. During the course of his booking, McElroy indicated that he resided at 464 Division Street, Fall River, Massachusetts. Also during the booking, McElroy was found to have on his person a piece of paper bearing a handwritten list of numbers "1" through "18." To the right of each such number appear other numbers, which TFA Delaney believes refer to weights. For instance, next to the numbers "16," "17" and "18" (corresponding to the numbers on the bags seized from Turbak's BMW), are the numbers "21.80," "21.70" and "21.90." These numbers add up to 65.50 and TFA Delaney reports that each of the bales of marijuana seized from the BMW weighs

approximately 20 plus pounds. The numbers which appear to be weights total 400.5 pounds. A similar document bearing a different set of 18 numbers was retrieved during an inventory search of McElroy's pickup truck.

27. Based upon all the foregoing, there is probable cause to believe (a) that Michael R. McElroy, William Turbak and others have conspired to possess with intent to distribute and to distribute marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846; (b) that McElroy has stored large quantities of marijuana at 521 King Street in Fall River, Massachusetts and that he has otherwise used those premises to facilitate his marijuana-trafficking activities; (c) that evidence of McElroy's marijuana-trafficking activities will be found in Apartment 3 North at 464 Division Street in Fall River, Massachusetts; and (d) that evidence of Turbak's marijuana-trafficking activities will be found at his residence at 42 Burt Street in Acushnet, Massachusetts.

28. Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics and money laundering investigations, I know the following:

    a. Narcotics traffickers find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system.

    b. Narcotics traffickers frequently maintain large amounts of

cash and other valuable assets such as precious metal or gems on hand in order to maintain and finance their ongoing business.

   c.  Narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where the narcotics traffickers have ready access to them, such as at their residences or other locations where they regularly conduct their narcotics business.

   d.  It is common for significant narcotics traffickers to hide contraband, proceeds of drug sales, records of drug transactions, weapons, ammunition, caches of drugs, large amounts of currency, financial instruments, keys for safe deposit boxes, precious metals, jewelry and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences for ready access and to conceal them from law enforcement authorities.

   e.  When narcotics traffickers amass proceeds from the sale of controlled substances, they commonly attempt to legitimize those profits. Narcotics traffickers use various means for these purposes, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money

drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.

f. Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, telephone numbers and/or paging numbers for their criminal associates. They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing.

g. Narcotics traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences.

h. To evade surveillance and law-enforcement tracking through Registry of Motor Vehicle Records, narcotics traffickers also frequently rent vehicles and maintain records of such rentals at their residences.

i. Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances. These paraphernalia include but are not limited to scales and packaging materials.

j. Narcotics traffickers maintain many associated apartments from which they conduct their business, such as mills or "stash" houses. Narcotics traffickers frequently maintain records and other documents that evidence rental or lease agreements for such apartments. These documents constitute evidence of the association of the various apartments, which, itself, is a tool of the

narcotics conspiracy. Drug traffickers frequently maintain such records in their residences.

k. Narcotics traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, containers, safe-deposit boxes and other instruments, which are further secured by combination and/or key locks of various kinds.

l. Narcotics traffickers frequently build "stash" places within their residences or other locations in order to store the items described above.

m. Narcotics traffickers frequently hire motor vehicles from rental companies and car services to transport narcotics and elude surveillance.

n. Narcotics traffickers frequently use fronts through which they are able to declare a source of employment and legitimate income, obtain credit, provide company names and addresses in which to register real property and other assets, launder narcotics proceeds, and accept or make shipments of narcotics and/or narcotics proceeds.

o. Courts have recognized that unexplained wealth is probative evidence of crimes motivated at least in part by greed, in particular, trafficking in controlled substances.

A. <u>The Objects Of The Search</u>

29. Based upon the foregoing, I respectfully submit that there is probable cause to believe that marijuana and related paraphernalia, including but not limited to packaging materials,

will be found at 521 King Street in Fall River, Massachusetts and that the following items will be found at that location as well as on the premises located at 464 Division Street, Apartment 3 North in Fall River, Massachusetts and the premises located at 42 Burt Street in Acushnet, Massachusetts: monies, jewelry, financial, real-estate, travel and car-rental records, as well as papers, books, computers and laptop computers containing ledgers, telephone numbers and addresses and billing records, customer lists, photographs and videotapes, narcotics paraphernalia, and weapons, which constitute evidence of the commission of, or are designed or intended as a means of the violation of, or are contraband or the fruit of the violation of the federal narcotics laws, including but not limited to the distribution of controlled substances, the possession of controlled substances with intent to distribute and the conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a) and 846.

B.  Premises to Be Searched:

30.  The premises to be searched at 521 King Street, Fall River, Massachusetts are described as follows:

> A single-family, two-storey, wood dwelling, with a light green exterior and dark green trim, with a wooden front porch. A detached garage is located to the right of and somewhat set back from the front of the dwelling. detached from the dwelling. With the exception of the driveway, the entire property, including the garage, is surrounded by a wooden fence. The numbers "521" are displayed on the front of the house near the front door.

31.  The premises to be searched at 464 Division Street, Apartment 3 North, in Fall River, Massachusetts are described as

follows:

> A three-storey, multi-family home with a white exterior and a front door located to the right of the front of the building as you face it. The numbers 464 appear next to the front door. Next to the front door is a set of three doorbells identified with the numbers and letters "1F," "2F" and "3F." On the left side of the dwelling is a side door, beside which is another set of doorbells identified with the numbers and letters "1R," "2R" and "3R." This side door leads to a stairwell which leads to the third floor. On the third floor, there are two doors. One door is unlocked and leads to an attic space. The other door is white and bears no identifying numbers or letters.

32. The premises to be searched at 42 Burt Street in Acushnet, Massachusetts are described as follows:

> A ranch style, single-family, wood dwelling with brown exterior and white trim and an attached garage. A mailbox in front of the dwelling bears the numbers "42."

33. Based on all of the foregoing information, therefore, I respectfully request that the Court issue (a) Criminal Complaints against Michael R. McElroy and William Turbak; (b) a warrant to search the premises at 521 King Street, Fall River, Massachusetts; (c) a warrant to search the premises at 464 Division Street, Apartment # 3 North, Fall River, Massachusetts; and (d) a warrant to search the premises located at 42 Burt Street, Acushnet, Massachusetts, more fully described above and in Exhibits A-1, A-2 and A-3 to the respective search warrant applications, for the property and items set forth above and in Exhibits B-1, B-2 and B-3 to the respective search warrant applications, all of which are

incorporated by reference herein.

Dated this 23rd day of January, 2004.

_____
DEAN M. FREDERICKS
Task Force Agent, United States
Drug Enforcement Administration

Sworn to and subscribed to before me in Boston, Massachusetts, this 23rd day of January, 2004.

_____
ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE